754 S.E.2d 501

**Gloria PITTMAN, Respondent,**

v.

**Jetter PITTMAN and Pittman Professional Land Surveying, Inc., Defendants,**

**of whom Jetter Pittman is, Petitioner.**

**Appellate Case No. 2011–203269.**

**Nos. 27352.**

Supreme Court of South Carolina.

Heard Nov. 5, 2013.
Decided Jan. 15, 2014.
Rehearing Denied March 6, 2014.

142

Thomas F. McDow, IV, and Erin K. Urquhart, both of Law Office of Thomas F. McDow, Rock Hill, for Petitioner.

Daniel D. D'Agostino, of York, for Respondent.

Justice KITTREDGE.

In this domestic action, we granted a writ of certiorari to review the court of appeals' decision affirming the family court's finding of transmutation, which resulted in the inclusion of Petitioner Jetter Pittman's premarital land surveying business in the marital estate. *Pittman v. Pittman,* 395 S.C. 209, 717 S.E.2d 88 (Ct.App.2011). Although we find the court of appeals erred in affirming the family court's reliance on the parties' premarital conduct in the transmutation analysis, we affirm based on the parties' conduct during the marriage. We find the evidence preponderates in support of a finding that the parties intended the land surveying business to be the common property of the marriage.

## I.

Jetter Pittman (Husband) and Gloria Pittman (Wife) were married in April 2000 and separated in March 2007. It was a second marriage for both, and they have no children together. Wife instituted this divorce action against Husband in May 2007, on the grounds of adultery. In addition, Wife argued to the family court that Husband's land surveying business, Pittman Professional Land Surveying, Inc., was transmuted into marital property and was thus subject to equitable apportionment.

Husband and Wife met and began their relationship in 1991. Wife worked as a registered nurse in Rock Hill, South Carolina. Husband, a licensed professional land surveyor, was living and working in Winston–Salem, North Carolina. The parties' relationship was long-distance at first, but in May 1993, Husband's job was transferred to Albemarle, North Carolina, and Husband then moved in with Wife in her Fort Mill, South Carolina home. From the time the parties began living together and throughout the marriage the parties pooled their funds in a joint checking account, and Wife paid

all of the parties' personal and household expenses from their joint account.

In addition to his full-time job, Husband regularly took side jobs as a surveyor. Throughout the parties' relationship, Wife assisted Husband with his surveying jobs by handling all the billing and accounting tasks and by performing light field duties on occasion. In 1996, Husband quit his full-time job and became self-employed, incorporating his surveying business (Business)[1] and initially operating from the upstairs bedroom of Wife's home.[2] Both parties had day-to-day responsibilities for the Business; Husband managed the surveying jobs and the employees, and Wife continued to handle all the financial and bookkeeping tasks for the Business, in addition to maintaining her employment as a registered nurse. Although this arrangement began at the inception of the Business—before the parties were married—it also continued during the marriage and did not cease until approximately six months after Wife filed for divorce.

After the parties married in 2000, they agreed for Wife to take on an increased role and participation in the Business and work only part-time at the hospital. As the Business grew, Wife increased her commitment to the Business, often working 35-hour weeks, while ultimately decreasing her nursing job to one day per week.[3] When the Business first began, the parties were sometimes unpaid for their work; however, by the time of separation, both Husband and Wife both drew a

---

1. The Business was incorporated as a statutory close corporation, or "S–Corp." Husband owned 100% of the shares. However, the Business's income tax returns listed Wife as the Secretary and the audit contact for the Business.

2. In 2003, the parties purchased with marital funds a property located at 314 Tom Hall Street in Fort Mill and operated the Business from there.

3. The parties agreed for Wife to continue working at the hospital to maintain health insurance coverage for both parties. However, as a result of her decreased work schedule at the hospital, Wife was unable to participate in the hospital's 401(k) match program. When Wife further reduced her hospital work schedule to one day per week, she was no longer eligible to receive health insurance benefits. Thus, beginning in 2006, both parties obtained health insurance coverage through the Business.

salary from the Business, with Wife receiving $4,200 per month. From the date of marriage to the date of separation, Wife's income steadily increased each year. The parties agreed to raise Wife's salary to increase her social security income because Wife was older than Husband[4]—a decision the parties made for their mutual benefit so they would have more money during their retirement.

Additionally, before the Business was firmly established and producing significant income, the parties purchased three surveying geodimeters at a cost of more than $30,000 each. The record reveals that, at the time of marriage, the parties were still servicing debt associated with the geodimeters. Further, in November 2002, both Husband and Wife signed an unlimited personal guaranty agreement to secure the Business's financial obligations.[5]

The family court granted Wife a divorce on the ground of adultery; ordered Husband to pay Wife $600 per month in permanent, periodic alimony; identified, valued, and equitably apportioned marital property and debts; and awarded wife $12,500 in attorney's fees. In identifying marital property, the family court found the Business was transmuted into marital property and was properly included in the marital estate. Specifically, the family court found:

---

4. Wife is approximately fourteen years older than Husband.

5. Husband claims "the" loan for which the guarantee was executed was timely repaid, so "the guaranty agreement expired by its own terms." However, the document is titled "Unlimited Guaranty Agreement" and reads:

> [T]o induce First Citizens Bank and Trust Company of South Carolina ... at its option, *at any time or from time to time* to make loans ... or to engage in any other transactions with [the Business], the Guarantor hereby absolutely guarantees to the Bank the timely prompt and complete payment ... of any and all indebtedness, obligations and liabilities of the [Business] to the Bank, and all claims of the Bank against the [Business], *now existing or hereafter arising....*

(emphasis added). Moreover, the fact that a loan associated with this guaranty was timely repaid before the date of filing does not render Wife's act in signing the personal guaranty meaningless. As discussed in more detail below, we find the fact that the parties used Wife's credit to assist the Business during the marriage is relevant in determining the parties' intent in the transmutation analysis.

> The [Wife] and [Husband] both worked in the company, increased its value, had a plan for growing and developing the business, jointly made decisions as to the business, jobs, loans, and employees. The [Wife] signed an unlimited guarantee for the business. The [Husband] clearly treated the business as a martial [sic] asset during the entirety of the marriage.

The family court emphasized that Husband was able to become self-employed in 1996 "because he was able to fall back on the [Wife's] full-time guaranteed income and the parties, prior to the marriage, pooled their money and paid all bills jointly."

In ascertaining the marital estate, the family court found the parties intended the Business to be a joint asset of the marriage. In including the value of the Business in the marital estate,[6] the family court rejected Husband's argument that he was entitled to a special equity in the value of Business as of the date of the marriage. The family court weighed the statutory factors and determined a 50/50 division of the marital estate was appropriate and equitable. The marital estate was apportioned accordingly.

Husband filed a motion for reconsideration pursuant to Rule 59(e), SCRCP, arguing the family court's finding that the Business was transmuted was unsupported by any evidence in the record demonstrating Husband's intent to treat the Business as a marital asset. The family court rejected Husband's argument, reiterating that the credible evidence objectively established transmutation. Husband appealed.

The court of appeals affirmed in part and reversed in part. Concerning the transmutation issue, the court of appeals found that Wife met her burden of showing the parties intended to treat the Business as a marital asset. Following the denial of Husband's petition for rehearing, this Court granted Husband's petition for a writ of certiorari to review the court of appeals' decision regarding the transmutation finding.

---

**6.** At trial, Wife contended the Business was worth $575,000. However, the family court found the Business was properly valued at $237,404. The family court's valuation of the Business is not challenged on appeal.

## II.

 " 'In appeals from the family court, the appellate court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. However, this broad scope of review does not require this Court to disregard the findings of the family court.' " *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011) (quoting *Eason v. Eason*, 384 S.C. 473, 479, 682 S.E.2d 804, 807 (2009)). "[T]he appellate court is not required to disregard the findings of the trial judge who was in a superior position to make credibility determinations." *Id.* at 385, 709 S.E.2d at 651–52.

### A.

### Transmutation

Husband argues the finding of transmutation was error because Wife presented no evidence that the parties intended the Business to be transmuted into marital property. Husband further claims the family court committed legal error in considering the parties' premarital conduct in the transmutation analysis. We agree with Husband on this latter point, but we find the record is replete with evidence of the parties' conduct during the marriage to support a finding of transmutation.

 The term "marital property" means "all real and personal property which has been acquired by the parties during the marriage and which is owned as of the date of filing or commencement of the marital litigation ... regardless of how legal title is held." S.C.Code Ann. § 20–3–630(A) (Supp. 2013). However, "[p]roperty acquired prior to the marriage is generally considered nonmarital." *Pirri v. Pirri*, 369 S.C. 258, 269, 631 S.E.2d 279, 285 (Ct.App.2006) (citing S.C.Code Ann. § 20–7–473(2) (Supp.2004)). Nevertheless, "[p]roperty that is nonmarital when acquired may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property." *Wilburn v. Wilburn*, 403 S.C. 372, 384, 743

S.E.2d 734, 740 (2013) (citing *Trimnal v. Trimnal,* 287 S.C. 495, 497–98, 339 S.E.2d 869, 871 (1986)).

■■■ "As a general rule, transmutation is a matter of intent to be gleaned from the facts of each case." *Johnson v. Johnson,* 296 S.C. 289, 295, 372 S.E.2d 107, 110 (Ct.App.1988). "The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage." *Jenkins v. Jenkins,* 345 S.C. 88, 98, 545 S.E.2d 531, 537 (Ct.App.2001) (citing *Pool v. Pool,* 321 S.C. 84, 86, 467 S.E.2d 753, 756 (Ct.App.1996)).

■■■ In terms of evidence tending to establish transmutation, "the use of property in support of a marriage is relevant to transmutation[; however] the mere use of income from nonmarital assets does not transmute those assets into marital property." *Wilburn,* 403 S.C. at 385, 743 S.E.2d at 741 (citing *Peterkin v. Peterkin,* 293 S.C. 311, 313, 360 S.E.2d 311, 313 (1987)).[7] Husband seeks to characterize this case as nothing more than the mere use of income from the Business to support the marriage. Contrary to Husband's characterization and assertions, Wife has presented evidence objectively establishing an intent by both parties to treat the Business as the common property of the marriage.

The court of appeals stated:

Wife was listed as secretary for the corporation. After the parties married in 2000, Wife, with Husband's consent, reduced the hours she worked at her nursing job to work full-time in the business and thus contributed less to her 401K and retirement accounts. Most significantly, Husband and Wife agreed that the business would pay Wife a higher salary for her services than what her services warranted

---

7. *See also Smallwood v. Smallwood,* 392 S.C. 574, 579–81, 709 S.E.2d 543, 546 (Ct.App.2011) (finding rental properties purchased by husband before marriage were not transmuted because all mortgages were paid with rental income, not marital funds, and wife provided only temporary and insubstantial assistance to husband in managing the rental properties); *Pirri v. Pirri,* 369 S.C. 258, 269, 631 S.E.2d 279, 285 (Ct.App.2006) (finding rental properties purchased by husband before common law marriage were not transmuted because wife did not assist in managing the property during the marriage and had no control over the rental income, which was not consistently placed in the parties' joint bank account).

with the expectation that this business decision would benefit both parties during their retirement together. Under these circumstances, we decline to disturb the finding that [the Business] had been transmuted.

*Pittman*, 395 S.C. at 222–23, 717 S.E.2d at 95 (citing *Lewis v. Lewis*, 392 S.C. at 392, 709 S.E.2d at 655).

The court of appeals' opinion is correct but the record contains further evidence in support of the transmutation finding. Wife's credible testimony establishes that the parties treated the Business as *their* business—not just Husband's business. Wife testified that all of the business decisions were made jointly and stated, "I can't really think of anytime that anything important happened or somebody was hired that we didn't discuss it together." We find Wife's testimony credible in every material respect. Moreover, Husband admitted that he and Wife worked together in the Business during the marriage.[8] The credible evidence is that Husband performed the field work and Wife handled all other aspects of the business, including running the office, scheduling jobs, handling payables and receivables, and maintaining the books.

Wife's role and authority in the Business was pervasive and ubiquitous, notwithstanding Husband's post-separation protestations to the contrary. We acknowledge that Husband never expressly declared the Business to be a marital asset, a fact on which Husband heavily relies. Yet, where the transmutation question is litigated, one does not expect to find an admission. A family court judge, unlike any other judge, is accustomed to resolving emotionally-charged and intensely personal issues. A family court judge understands well that the emotionally-charged issues encountered daily are not limited to matters concerning children. Day in and day out, the demanding and taxing service on the family court bench requires the judge to carefully consider the competing evidence and make credibility determinations and findings of fact.

---

8. By the time of the separation, the Business had become so profitable that "money really wasn't that much of an object" and the parties used Business revenue to directly pay personal, marital expenses. For example, the parties used Business revenue to pay for many items, including alcohol, groceries, vacations, a laptop computer, Carolina Panthers PSL tickets, and over $25,000 in repairs to an antique vehicle. We, of course, recognize that the use of nonmarital funds in support of the marriage, by itself, is not sufficient to establish transmutation.

Here, Husband is adamant that he never intended the Business to become the common property of the marriage, and as noted, transmutation is ultimately a matter of discerning the parties' intent. We note that the record is scant concerning Husband's testimony on the transmutation issue, for portions of his testimony were omitted from the record on appeal. It appears the omitted testimony related to the transmutation question. What we are left with is Husband's conclusory claim that he never intended the Business to become a marital asset. The record before this Court preponderates otherwise and leads us to agree with the able family court judge that the conduct of the parties during the marriage objectively demonstrates a mutual intent to regard the Business as a marital asset.

■ To be clear, the family court committed an error of law in relying on Wife's premarital contributions to the Business in support of its transmutation finding. S.C.Code Ann. § 20–3–630(A) (Supp.2013) (defining the term "marital property" as "all real and personal property which has been acquired by the parties *during the marriage* " (emphasis added)); *see also Pirri,* 369 S.C. at 270, 631 S.E.2d at 286 (noting that any transmutation must have occurred, if at all, *after* the date of the common law marriage). However, the record reveals ample evidence to support a finding that the parties' actions *during the marriage* manifested intent for the Business to be transmuted. We find both parties' significant day-to-day involvement in the business—including the parties' decision for Wife to all but forfeit her nursing career, coupled with Wife's credible testimony that all major business decisions were made jointly, including the parties' decision to structure Wife's pay to benefit both parties at the time and upon Wife's retirement—demonstrates the parties' intent to treat the Business as a marital asset. *See Edwards v. Edwards,* 384 S.C. 179, 185, 682 S.E.2d 37, 40 (Ct.App.2009) (finding transmutation of Husband's life estate in a produce stand where facts established the following: profits from the produce stand provided the parties with their main source of income, marital funds were used to build equity in the produce stand, Wife participated in the daily operations of the produce stand, and both parties' names were listed on the building permit for the produce stand); *Simpson v. Simpson,* 377 S.C. 527, 538, 660

S.E.2d 278, 284 (Ct.App.2008) (finding land upon which marital home was built was transmuted where the parties used it in support of the marriage, cleared the land together, and built the marital residence together with marital funds); *Jenkins,* 345 S.C. at 98–100, 545 S.E.2d at 537 (finding acreage and rental home Husband inherited were transmuted into marital property where the parties strategically made the property part of their joint retirement plan, Wife was substantially involved in the general care and maintenance of the property, and the parties expended marital funds on improving the property); *cf. Odom v. Odom,* 141 P.3d 324, 333 (Alaska 2006) (finding Husband's separate business was not transmuted into marital property because Wife played no role in the day-to-day operation or management of the business, Wife's name was not on any bank accounts and her credit was never used for any bank loans, and she never owned any stock).

Additionally, marital funds were expended in discharging the indebtedness of the geodimeters, and Wife's personal credit was used in support of the Business. We find this fact is further evidence of intent to transmute, beyond the mere use of the Business in support of the marriage. *Frank v. Frank,* 311 S.C. 454, 456–57, 429 S.E.2d 823, 825 (Ct.App.1993) (finding premarital home belonging to Wife was transmuted where Husband personally guaranteed the note secured by a mortgage on the property); *see Canady v. Canady,* 296 S.C. 521, 374 S.E.2d 502 (Ct.App.1988) (finding use of property in support of the marriage and joint discharge of indebtedness evidenced intent for property to be transmuted); *Wyatt v. Wyatt,* 293 S.C. 495, 497, 361 S.E.2d 777, 779 (Ct.App.1987) (finding joint efforts to discharge indebtedness may transmute previously acquired property into marital property).

In sum, while the court of appeals erred in affirming the family court's reliance on premarital conduct to support the transmutation finding, we find ample evidence of the parties' conduct during the marriage to warrant a finding of transmutation concerning the Business.

## B.

### Special Equity

Alternatively, Husband presents two arguments. First, Husband argues that even if the Business was properly

transmuted, he is entitled to receive a special equity for the value of the Business as of the date of marriage. We disagree.

Husband's argument is inconsistent with the law of this state. "When property is determined to have been transmuted, the entire property, not just a portion of the property, is included in the parties' marital property which is thereafter apportioned by the family court using the criteria set forth in [the equitable apportionment statute.]" *Calhoun v. Calhoun,* 339 S.C. 96, 106, 529 S.E.2d 14, 20 (2000). The proper way to account for such a direct financial contribution is in the overall division of the marital estate. More to the point, such a direct financial contribution should be taken into account in determining the percentage division of the marital estate. *See Dawkins v. Dawkins,* 386 S.C. 169, 687 S.E.2d 52 (2010) (stating "[w]e approve of the approach announced in *Toler* . . . as the sole method in accounting for a spouse's special equity in marital property"), *abrogated on other grounds by Lewis,* 392 S.C. at 384, 709 S.E.2d at 650; *Toler v. Toler,* 292 S.C. 374, 380 n. 1, 356 S.E.2d 429, 432 n. 1 (Ct.App.1987) (finding error where the family court separated and subtracted the asset's nonmarital value from the marital estate and awarding that "special equity" to the inheritor in addition to his or her portion of the marital estate and stating "[t]he correct way to treat the [nonmarital property] is as a contribution by the [inheritor] to the acquisition of marital property. This contribution should be taken into account in determining the percentage of the marital estate to which the [inheritor] is equitably entitled upon distribution."). Indeed, once the Business was determined to have been transmuted, the full value of the Business was appropriately included in the marital estate.

Second, in recognition of the law rejecting a special equity under these circumstances, Husband asserts he was entitled to a credit for the premarital value of the Business. We agree with Husband in the abstract, but we are unable to conclude that the family court erred. At the Rule 59(e), SCRCP hearing when this argument was presented, the family court noted the parties stipulated to a "50/50 division." Although there is disagreement as to whether the parties stipulated to an equal division, we have carefully reviewed the parties'

respective contributions to the acquisition of the marital estate and find the equitable apportionment ordered by the family court to be reasonable. *See Wilburn*, 403 S.C. at 390, 743 S.E.2d at 744 ("On appeal, we must review the fairness of the overall apportionment, and if equitable, we will uphold it regardless of whether we would have weighed specific factors differently." (citing *Roberson v. Roberson*, 359 S.C. 384, 389, 597 S.E.2d 840, 842 (Ct.App.2004))); *Thomas v. Thomas*, 346 S.C. 20, 25–26, 550 S.E.2d 580, 583 (Ct.App.2001) ("On review, this Court looks to the overall fairness of the apportionment, and if the end result is equitable, that this Court might have weighed specific factors differently than the family court is irrelevant." (citing *Johnson*, 296 S.C. at 300, 372 S.E.2d at 113)).

## III.

We affirm as modified. The family court erred in considering the parties' premarital conduct in the transmutation analysis, but we find the evidence during the marriage establishes that the Business was transmuted into marital property.

**AFFIRMED AS MODIFIED.**

TOAL, C.J., PLEICONES, BEATTY, and HEARN, JJ., concur.