# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

John Jordan, Appellant,

v.

Melissa Postell, Respondent.

Appellate Case No. 2018-001024

Appeal From Charleston County
Alice Anne Richter, Family Court Judge

Published Opinion No. 5848
Heard March 1, 2021 – Filed August 18, 2021

## AFFIRMED IN PART AND REVERSED IN PART

Justin M. McGee, of McGee Law Firm, LLC, of
Charleston, for Appellant.

Donald Jay Budman, of Solomon Budman & Stricker,
LLP, of Charleston, for Respondent.

**GEATHERS, J.:** In this divorce action, John Jordan (Husband) argues the family court erred by (1) finding a house purchased by Melissa Postell (Wife) eight years before the marriage was not transmuted into marital property; (2) incorrectly calculating Husband's special equity interest in said property; (3) finding a different house sold to Husband by Wife's father three weeks before the marriage was marital property; (4) not distributing the parties' retirement accounts equally; (5) failing to award Husband alimony; (6) failing to find that the parties were jointly responsible for their respective 2016 state and federal income tax liabilities—and jointly entitled

to any refunds; and (7) failing to award Husband attorney's fees. We affirm in part and reverse in part.

## FACTS/PROCEDURAL HISTORY

The principal issue in this matter concerns the house located at 864 Harbor Place Drive in Charleston (Harbor Place). Eight years before her marriage to Husband, Wife purchased Harbor Place from her father on April 28, 1995, for $92,800.[1] Wife initially refinanced the mortgage in 1998 before refinancing it again on December 31, 2002. The mortgage balance owed as of that date was $108,000. Then, on June 18, 2003, Wife opened a Home Equity Line of Credit (Home Equity Loan), secured by Harbor Place, in an amount not to exceed $40,250. The parties married shortly thereafter, on November 2, 2003.

Also relevant to the divorce action is Husband's purchase of the house located at 694 Ponderosa Drive in Charleston (Ponderosa). On October 8, 2003—three weeks before his marriage to Wife—Husband purchased Ponderosa from Wife's father for $125,550. Wife's father included the phrase "LOVE AND AFFECTION FOR MY SON-IN-LAW" in the deed transferring the property as consideration for the sale to Husband. From its initial purchase to the present, the parties used Ponderosa exclusively as a rental property.

After almost thirteen years of marriage, Husband filed for divorce on April 1, 2016. Additionally, Husband filed a motion for temporary relief requesting financial assistance from Wife for his rental costs, attorney's fees, and an advance of the equitable distribution of the parties' marital assets. On May 2, 2016, a hearing was held before the family court on the motion for temporary relief. The family court issued its temporary order on the motion shortly thereafter. The order required the parties to attend mediation, denied both parties spousal support, denied Husband's request for an advance on his portion of the marital assets, and held the issue of attorney's fees in abeyance. The parties attended mediation on June 28, 2016, but the mediation was unsuccessful. The final hearing on the matter was held on July 11 through 13, 2017.

On October 9, 2017, the family court issued its Final Order and Decree of Divorce, finding the following: (1) Wife was the sole owner of Harbor Place and it did not transmute into marital property; (2) Husband had an $18,000 special equity

---

[1] Wife's father, who is a residential builder and developer, sold the home to Wife at a discounted price. The home was valued at $102,000 at the time of the purchase.

interest in Harbor Place based on the $30,000 value of the home improvements he made; (3) Ponderosa was transmuted into marital property, therefore, Husband was required to pay Wife $19,200 for her interest in the property, but could retain exclusive ownership and possession of the property; (4) each party was entitled to 45% of the other party's retirement; (5) Husband was not entitled to alimony; (6) each party was responsible for their own tax obligations; and (7) Husband was not entitled to attorney's fees.

On October 23, 2017, Husband filed a motion to reconsider, alter, or amend the family court's order, challenging the aforementioned findings by the court, save for the court's ruling on alimony. On May 2, 2018, the family court filed an amended final order and decree, acknowledging the fact that the Home Equity Loan was indeed marital property. All other findings of the family court remained intact. This appeal from Husband followed.

## ISSUES ON APPEAL

1. Did the family court err by finding that Husband failed to present sufficient evidence to establish transmutation of Harbor Place?

2. Did the family court err in its calculation of Husband's special equity interest in Harbor Place?

3. Did the family court err by finding that Wife provided sufficient evidence to establish transmutation of Ponderosa?

4. Did the family court err in its apportionment of the parties' respective retirement accounts?

5. Did the family court err by denying Husband alimony?

6. Did the family court err by finding the parties were responsible for their own individual tax returns?

7. Did the family court err by not awarding Husband attorney's fees?

## STANDARD OF REVIEW

"The family court is a court of equity." *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Therefore, the proper standard of review in family

court matters is de novo. *Stoney v. Stoney*, 422 S.C. 593, 594, 813 S.E.2d 486 (2018). Accordingly, "[o]n appeal from the family court, the appellate court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence." *S.C. Dep't of Soc. Servs. v. Polite*, 391 S.C. 275, 279, 705 S.E.2d 78, 80 (Ct. App. 2011). However, "this broad scope of review does not alter the fact that a family court is better able to make credibility determinations because it has the opportunity to observe the witnesses." *Wilburn v. Wilburn*, 403 S.C. 372, 380, 743 S.E.2d 734, 738 (2013). "Additionally, the de novo standard does not relieve the appellant of the burden of identifying error in the family court's findings." *Id.* "Accordingly, we will affirm the decision of the family court in an equity case unless its decision is controlled by some error of law or the appellant satisfies the burden of showing the preponderance of the evidence actually supports contrary factual findings by th[e appellate] court." *Holmes v. Holmes*, 399 S.C. 499, 504, 732 S.E.2d 213, 216 (Ct. App. 2012).

## LAW/ANALYSIS

### I. Harbor Place

Husband argues Harbor Place is transmuted marital property because (1) Harbor Place was used exclusively for marital purposes during the marriage; (2) the parties are jointly liable for the Home Equity Loan debt secured by the property; (3) the parties, working together, caused a $108,000 reduction in mortgage indebtedness during the marriage through the use of marital funds; (4) the funds used for Harbor Place and borrowed against Harbor Place were commingled and are incapable of being traced; (5) Husband personally did significant work to maintain and improve the property; and (6) the Home Equity Loan was used almost exclusively for Husband's benefit. We disagree.

Property acquired by either party before the marriage is generally nonmarital property. S.C. Code Ann. § 20-3-630(A)(2) (2014). "Nevertheless, '[p]roperty that is nonmarital when acquired may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property.'" *Pittman v. Pittman*, 407 S.C. 141, 148, 754 S.E.2d 501, 505 (2014) (quoting *Wilburn*, 403 S.C. at 384, 743 S.E.2d at 740). "As a general rule, transmutation is a matter of intent to be gleaned from the facts of each case." *Id.* at 149, 754 S.E.2d at 505 (quoting *Johnson v. Johnson*, 296 S.C. 289, 295, 372 S.E.2d 107, 110 (Ct. App. 1998)). "The spouse claiming transmutation must produce objective evidence showing that, during the

marriage, the parties themselves regarded the property as the common property of the marriage." *Id.* (quoting *Jenkins v. Jenkins*, 345 S.C. 88, 98, 545 S.E.2d 531, 537 (Ct. App. 2001)).

We find Husband did not present sufficient evidence of Wife's intent to transmute Harbor Place into marital property. Wife purchased the house eight years prior to the marriage, she never put Husband's name on the title or mortgage, and the funds used to pay the mortgage were not so commingled as to make them untraceable. *See Pittman*, 407 S.C. at 148, 754 S.E.2d at 505; *Ray v. Ray*, 296 S.C. 350, 353, 372 S.E.2d 910, 912 (Ct. App. 1988) ("[T]he mere use of nonmarital property to support the marriage, without some additional evidence of intent to treat it as property of the marriage, is not sufficient to establish transmutation."). At the final hearing on the matter, Wife testified that she always referred to Harbor Place as "my house" and always considered it as such. Husband provided no evidence or testimony to the contrary. *See Pittman*, 407 S.C. at 149, 754 S.E.2d at 505 ("The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage." (quoting *Jenkins*, 345 S.C. at 98, 545 S.E.2d at 537)).

Husband argues the fact that Wife used marital funds to discharge the mortgage indebtedness, which, by his estimation, she would not have been able to do without his financial contributions to the household, provides further support for transmutation. However, this fact alone does not evince Wife's intent to relinquish sole ownership of her home. *See Pittman*, 407 S.C. at 148, 754 S.E.2d at 505 ("As a general rule, transmutation is a matter of intent to be gleaned from the facts of each case."); *Fitzwater v. Fitzwater*, 396 S.C. 361, 368–69, 721 S.E.2d 7, 11 (Ct. App. 2011) (finding the use of marital funds to pay a nonmarital property's mortgage insufficient to transmute the property); *see also* Roy T. Stuckey, *Marital Litigation in South Carolina* 337 (5th ed. 2020) ("If I use my paycheck (marital funds) to pay the mortgage so my family does not lose its home (how else am I supposed to pay the mortgage?), that is not evidence of my intent to give up sole ownership of the property."). The mere fact that Husband contributed financially to the marriage by paying various utility bills and providing food to his Wife and children does not sufficiently show that the mortgage was discharged through the parties' *joint efforts*. *See Wyatt v. Wyatt*, 293 S.C. 495, 496–97, 361 S.E.2d 777, 779 (Ct. App. 1987) (finding that a mobile home purchased prior to a marriage was transmuted in part because the husband "contributed to the remaining mortgage payments"); *id.* at 497, 361 S.E.2d at 779 ("In the instant case, the wife acquired legal title to the mobile home prior to the marriage, but paid off only one half of the mortgage. The remainder of the debt was discharged through the *joint efforts* of the husband and wife."

(emphasis added)); *Nestberg v. Nestberg*, 394 S.C. 618, 624, 716 S.E.2d 310, 313 (Ct. App. 2011) (finding property purchased by the husband before the marriage was transmuted into marital property in part because the wife paid the mortgages on the property for several years after the husband lost his job); *id.* ("[The husband] agreed he relied on [the wife]'s income and credit cards to develop the land . . . and that, 'to a degree,' [the wife] 'had been carrying the majority of the income for five years.'"). As aforementioned, the uncontroverted evidence shows that Wife personally made *all* of the mortgage payments with her wages. In fact, Husband did not even know how much was due on the mortgage each month. By Husband's own admission, his wages earned were used to pay for household living expenses and maintaining the house. As such, we find the mere fact that Wife paid her mortgage during the marriage with marital funds does not evince Wife's intent to transmute Harbor Place.

Moreover, Husband cites *Frank v. Frank*[2] as standing for the proposition that "when both spouses assume responsibility for debt secured by nonmarital property, this is likely conclusive evidence of an intent to transmute the property into marital property." We disagree with Husband's characterization of *Frank*. In *Frank*, the wife was given a home by her parents three years before the marriage. 311 S.C. at 455, 429 S.E.2d at 824. The home had a $21,000 mortgage at the time the wife received it. *Id.* at 455–56, 429 S.E.2d at 824. Two years into the parties' marriage, they separated, and the wife refinanced the house to consolidate bills. *Id.* at 456, 429 S.E.2d at 824–25. Subsequently, the parties reconciled, started living together again, and obtained home equity loans of $30,000. *Id.* at 456, 429 S.E.2d at 825. The parties obtained the loans jointly and used them almost exclusively for furnishing and remodeling the house at issue. *Id.* at 456–57, 429 S.E.2d at 825. The court held that, "to the extent that the husband is liable for the home improvement loan, the marital home is transmuted." *Id.* at 457, 429 S.E.2d at 825. Here, the evidence shows that Wife obtained the Home Equity Loan alone and the funds were used primarily for Husband's personal affairs. The record contains no evidence that the Home Equity Loan was intended as a means to build equity in Harbor Place. *See Johnson*, 296 S.C. at 295, 372 S.E.2d at 111 (stating the use of marital funds to build equity in the property may provide objective evidence showing that the parties themselves regarded the property as the common property of the marriage).

Based on the foregoing, we conclude the family court correctly found that Harbor Place was not transmuted into marital property.

## II.   Special Equity

---

[2] 311 S.C. 454, 429 S.E.2d 823 (Ct. App. 1993).

Because the parties stipulated that Harbor Place was worth $300,000 at the time of filing and the balance owed on the Home Equity Loan was $26,891.36, the family court found that Harbor Place had approximately $273,000 in equity. As such, the family court concluded that Husband had an $18,000 special equity interest in Harbor Place based on the $30,000 value of the home improvements he made. These improvements included building the deck onto the back of the house, building a privacy fence in the back yard, and installing a dishwasher and microwave. The family court found that much of what Husband claimed as improvements that he contributed to the home was actually routine maintenance.

Husband argues that even if the family court correctly found that Harbor Place was not transmuted, the court erred in its calculation of his special equity interest in the home. He argues that he is entitled to half of the increase in value Harbor Place experienced during the marriage, or in the alternative, at least half of the increase in equity that resulted from the reduction in mortgage indebtedness. By his estimation, these figures come out to $106,500[3] and $54,000[4] respectively. He further argues that he is entitled to the $18,000 previously granted by the family court in addition to either of the aforementioned amounts.

"[A]ny increase in value in nonmarital property, except to the extent that the increase resulted directly or indirectly from efforts of the other spouse during marriage[,]" constitutes nonmarital property. S.C. Code Ann. § 20-3-630(A)(5) (2014). "A spouse has an equitable interest in improvements to property to which he or she contributed, even if the property is nonmarital." *Calhoun v. Calhoun*, 331 S.C. 157, 172, 501 S.E.2d 735, 743 (Ct. App. 1998), *aff'd in part, rev'd in part*, 339 S.C. 96, 529 S.E.2d 14 (2000).[5] "The increase in the value of a nonmarital asset

---

[3] Husband based this amount on Harbor Place's increase in value over the course of the marriage from $195,000 to $300,000 (+$105,000). He then added the discharge of $108,000 of mortgage principal to this appreciated amount and arrived at $213,000. Of which, his share would be $106,500.

[4] This amount is half of the $108,000 mortgage balance Wife paid throughout the marriage.

[5] The supreme court reversed the court of appeals' "finding that the petitioner [was] not entitled to post-judgment interest because it was not pled and because the Rule 59[, SCRCP] motion in which petitioner requested such relief was untimely." *Calhoun*, 339 S.C. at 104, 529 S.E.2d at 19. The supreme court affirmed the court of appeals' other findings.

resulting from the use of marital funds to reduce indebtedness on the asset constitutes marital property subject to equitable division." *Id.* at 171, 501 S.E.2d at 742.

First, we disagree with Husband that he is entitled to half the full appreciation in value of Harbor Place. The record contains no evidence that the full appreciation in the value of the home resulted from Husband's contributions. Passive increase in the value of nonmarital property as a result of inflation does not constitute marital property. *See* § 20-3-630(A)(5); *Calhoun v. Calhoun*, 331 S.C. at 173–74, 501 S.E.2d at 743–44 (finding the wife was not entitled to a special equity interest in the portion of the increase in the value of the husband's vacation home attributable to inflation). As mentioned in Section I, Husband did not personally make a single payment towards Harbor Place's mortgage, nor did he provide additional objective evidence that other than the $30,000 determined by the family court, the appreciation in value was due to any improvements he made.

However, based on this court's ruling in *Calhoun*, as affirmed by our supreme court, it is clear that the increase in the equity in a nonmarital asset resulting from the use of marital funds to reduce indebtedness on the asset constitutes marital property subject to equitable division. *See* 331 S.C. at 171, 501 S.E.2d at 742; *id.* at 174, 178, 501 S.E.2d at 744, 746 (finding a wife was entitled to special equity in the amount of 50% of the reduction in the mortgage indebtedness on a husband's vacation home, while finding the wife was not entitled an interest in the appreciation in the home's market value). The uncontroverted evidence shows that Wife used marital funds to reduce the mortgage indebtedness of Harbor Place by $108,000 over the course of the marriage. Therefore, we agree with Husband that the increase in the equity in the home due to the reduction of mortgage indebtedness should have been included in the marital estate. *See id.*; *cf. Wilson v. Wilson*, 270 S.C. 216, 222, 241 S.E.2d 566, 569 (1978) (finding a wife was entitled to the equitable ownership of a portion of the property purchased solely by the husband during the marriage because her efforts at remaining gainfully employed "plus the expenditure of her income for household expenses not only contributed to the material success of the family but also freed her husband's earnings for investment").

Because the $108,000 reduction in mortgage indebtedness should have been included in the marital estate, the family court erred in the amount of the special equity awarded to Husband. *See id.* Accordingly, we find Husband is entitled to half this amount ($54,000), plus the $18,000 awarded by the family court for his efforts in improving Harbor Place ($72,000 in total).

III. **Ponderosa**

Husband argues the family court erred by finding Ponderosa transmuted into marital property. We disagree.

The family court found Wife submitted significant evidence that Ponderosa was transmuted. This evidence included documents showing that Husband bought the home from Wife's father three weeks before their marriage and Wife's testimony that the parties always intended to use the home as an investment property to generate income to support their children's college and the parties' retirement needs. Further, the court found that Husband ceded management duties of the property to Wife shortly after the marriage and Wife handled paying the mortgage for the house from a joint "relationship checking account." Having found Ponderosa was transmuted into marital property, the family court ordered Husband to pay Wife her equitable share of the property: $19,200.[6] Husband was granted exclusive ownership and possession of the property.

Husband conceded that the purpose of the rental property was to support the parties' retirement and their children's education. *See Pittman*, 407 S.C. at 148, 754 S.E.2d at 505 ("Property that is nonmarital when acquired may be transmuted into marital property if it . . . is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property."). Further, Wife handled the majority of the tenant management duties, paid the mortgage on the house using the joint "relationship checking account," and used the Home Equity Loan to pay the home's mortgage when the parties did not have a tenant in the home. Furthermore, Wife's father essentially included as consideration for the sale of the home the fact that Husband was marrying his daughter[7]—providing further evidence that the purpose of the home was to support the marriage. The objective evidence shows that the only reason Ponderosa was in Husband's name and not Wife's (or both) is because the parties thought it would be most advantageous for him to purchase it as a first time homebuyer to receive the tax credit. Therefore, we find Wife provided sufficient evidence that the parties regarded the property as marital and Husband intended it as such. *Id.* at 149, 754 S.E.2d at 505 ("The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage."). Accordingly, the family court did not err in finding Ponderosa was transmuted.

---

[6] The parties stipulated that the equity in the property was $48,000.

[7] Wife's father called Husband his "son-in-law" even though Husband was technically not his son-in-law at the time of the purchase.

## IV.    Retirement Account

Husband argues the family court erred by not dividing the parties' retirement accounts equally.  We disagree.

The family court found that all of the funds in Husband's retirement account were acquired during the marriage, while most, but not all, of Wife's funds were acquired during this time.  Because Wife had funds rolled over into her retirement account from a job she had prior to the marriage, the court found that the premarital portion of Wife's retirement was nonmarital.  As such, the court found the value of Husband's retirement account subject to division was $17,366.49,[8] and Wife's was $185,000.

Further, the family court found that while Husband's availability due to shift work and periods of unemployment allowed Wife to work more and progress in her career to some extent, there was evidence that established Husband undertook more leisure activities than Wife during his free time and did side work in order to obtain benefits primarily for himself (fishing, hunting, etc.).  Meanwhile, Wife worked overtime and used that income to cover shortfalls in marital expenses.  As such, the court found that each party was entitled to 45% of the other party's retirement.  This meant that Wife was entitled to 45% of husband's marital retirement, totaling $7,814.92, while Husband was entitled to 45% of Wife's marital retirement, totaling $83,250.00.[9]

"When distributing marital property, the family court should consider all fifteen factors set forth in the Code."  *Craig v. Craig*, 365 S.C. 285, 290, 617 S.E.2d 359, 361 (2005).  These factors are as follows: (1) the duration of the marriage; (2) marital misconduct or fault of the parties; (3) the parties' contributions; (4) the income of each spouse; (5) the health of each spouse; (6) each spouse's need for training or education; (7) the nonmarital property of each spouse; (8) the parties' retirement benefits; (9) the existence of a spousal support award; (10) the use of the marital home; (11) any tax consequences; (12) the existence of any support obligations; (13) any lien or encumbrances on marital property; (14) child custody

---

[8] The parties separated at the end of March 2016, and Husband filed for divorce on April 1, 2016.

[9] In its final order and amended final order, the family court erroneously wrote this figure as $82,350.00.

arrangements and obligations; and (15) such other relevant factors as the court enumerates in its order.  S.C. Code Ann. § 20-3-620(B) (2014).

Here, the record reflects that the family court considered all factors set forth in the Code.  In deviating from the standard 50% division, the court cited the fact that throughout the marriage, Husband failed to maximize his employment opportunities while Wife sacrificed possible leisure time to work overtime and advance in her career.  We find the court did not err in its division of the retirement accounts.  *See Fitzwater v. Fitzwater*, 396 S.C. 361, 370–71, 721 S.E.2d 7, 12 (Ct. App. 2011) (awarding a husband 60% of the marital estate because "[the w]ife brought in little to no money or assets during the marriage, while [the husband] provided the majority of income and assets").

## V.    Alimony

Husband argues the family court erred by denying his request for alimony, citing the fact that he is "crippled by significant debt."  We disagree.

In making an award of alimony or separate maintenance and support, the court must consider and give weight in such proportion as it finds appropriate to the following factors: (1) duration of the marriage; (2) physical and emotional health of the parties; (3) educational background of the parties; (4) employment history and earning potential of the parties; (5) standard of living established during the marriage; (6) current and reasonably anticipated earnings of the parties; (7) current and reasonably anticipated expenses of the parties; (8) marital and nonmarital property of the parties; (9) custody of children; (10) marital misconduct or fault; (11) tax consequences; (12) prior support obligations; and (13) other factors the court considers relevant. S.C. Code Ann. § 20-3-130(C) (2014).

In denying Husband's request for alimony, the family court noted the following relevant facts: (1) the twelve-year duration of the marriage; (2) both parties were in good health and able to support themselves through their work in the coming decades; (3) Wife possessed a nursing degree with twenty-three years of experience, while Husband had some college credits, a commercial driver's license, and boat mechanic certification; (4) both parties worked throughout the thirteen-year marriage, but Husband, having college credits and specialized training, failed to maximize his earning potential, such as failing to seek management positions in the

course of his employment;[10] (5) the parties enjoyed a middle-class standard of living during the marriage and were each able to maintain a standard of living similar to, albeit more modest than, that enjoyed during the marriage upon the divorce; (6) both parties were capable of supporting themselves financially into the future; (7) Husband had the expense of Ponderosa, which still carried a mortgage; (8) the parties each had a home—Harbor Place and Ponderosa; (9) although the parties were sharing custody of the children and Husband was paying child support, most of the burden of supporting the children on a daily basis would continue to fall on Wife; (10) there were no fault grounds pled and no evidence of fault for the breakdown of the marriage; (11) the division of property would not create any adverse tax consequences for either party; (12) neither party had prior support obligations; and (13) Husband testified that Wife was not responsible for many of the changes in his standard of living.

The record reflects that the family court considered all factors set forth in the Code. Further, Husband conceded at the final hearing that Wife was not responsible for his current financial predicament. Accordingly, we find the court did not err by denying Husband's alimony request.

## VI.   Tax Returns

Husband argues the family court erred in finding that each party is liable for their own 2016 income taxes. He contends that he "is entitled to, at least, one-quarter of the combined tax refund for 2016 received by Wife (or $3,122.75) and contribution from Wife for one-quarter of [his] 2016 combined tax obligation (or $940) in a total amount of $4,062.75." We disagree.

In its order, the family court found that the 2016 tax returns' liabilities and refunds were substantially accrued after the filing of the action and the evidence was insufficient to allow the family court "to determine each party's contribution to the accumulation of the assets or creation of the liability pre-filing." We agree with the family court that the filing of separate returns was appropriate. Husband chose to separate from Wife three months into the year. Considering the parties were separated for three-fourths of the year, it is logical that they would file separate returns. Husband presented no evidence that Wife was required to file a joint return

---

[10] The family court noted that "[h]ad [Husband] maximize[d] his certification as a boat mechanic[] to become a Master Mechanic, his income could have been as high as $85,000.00/year."

with him.[11]  We find credible Wife's testimony that her accountant advised her that it would be more advantageous to file a separate return due to Wife's pay increase. Accordingly, the family court did not err.

## VII.  Attorney's Fees

Husband argues the family court erred by denying his request for attorney's fees.[12]  We disagree.

In determining whether to award attorney's fees, the family court must consider "(1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992).  In determining what amount in attorney's fees is reasonable, a court should then consider "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

In its order, the family court delineated its consideration of the *E.D.M.* and *Glasscock* factors, finding the following: (1) The nature, extent, and difficulty of the legal services rendered were not of a complex nature; (2) both parties devoted a great deal of time to the case; (3) both counsel in the case enjoyed good standing as legal professionals before the court and the local legal community; (4) neither party had entered into contingency fee arrangements with their respective counsel, and each party had accrued moderate fee amounts; (5) both parties obtained some beneficial results through the litigation; (6) neither party could pay the entire amount of attorney's fees charged by their counsel; however, both could afford to pay their own respective fees based on their income or income prospects; (7) the hourly rates charged by both counsel were customary for similar services; (8) both parties were capable of being gainfully employed, and although Husband was currently unemployed, given his age and experience in his industry, he had the ability to become professionally successful for the foreseeable future; and (9) awarding attorney's fees would affect each party's standard of living.  The family court found that neither party was in a position to pay the total amount of their own attorney's

---

[11] Husband testified that he did not remember whether he verbally gave Wife the choice on how to file the tax return.

[12] Husband requested $41,334.63 in attorney's fees.

fees—let alone the other party's. As aforementioned, Husband conceded that his current financial situation resulted from events that occurred after he separated from Wife, and he conceded that Wife is not at fault for his change in his standard of living. Wife has physical custody of the parties' two children and, as such, is primarily responsible for providing for the children's care. Therefore, we find denying Husband's request for attorney's fees was proper in this matter.

## CONCLUSION

Based on the foregoing, we affirm the family court's order on all issues with the exception of issue 2. We reverse the family court's order on issue 2 and find Husband is entitled to half of the reduction in mortgage indebtedness as special equity, in addition to the amount previously ordered by the family court.

**AFFIRMED IN PART AND REVERSED IN PART.**

**KONDUROS and MCDONALD, JJ., concur.**